## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

ROBERT EUGENE WILSON,

      **Plaintiff,**

v.                                    **Case No. 3:20-cv-00054**

TWITTER,

      **Defendant.**

### PROPOSED FINDINGS AND RECOMMENDATIONS

Pending before the Court are Plaintiff's *pro se* Complaint, (ECF No. 2), and Defendant's Motion to Dismiss, (ECF No. 14). This matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and by standing order is referred to the undersigned United States Magistrate Judge for the submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B).

For the reasons that follow, the undersigned **RECOMMENDS** that Defendant's Motion to Dismiss, (ECF No. 14), be **GRANTED**; and that the Complaint, (ECF No. 2), be **DISMISSED,** with prejudice, and removed from the docket of the court.

## I.    Relevant Facts

Plaintiff, Robert Eugene Wilson ("Wilson"), filed a complaint in this Court on January 23, 2020. (ECF No. 2). In the complaint, Wilson assets that Defendant, Twitter, Inc., ("Twitter"), "has on more than 2 times = 3 times [sic] closed my account based on my freedom of speech and or heterosexual expressions, and or whatever excuses." (*Id.* at 4). Wilson explains that he operated a Twitter account under the username

"[@]iwontBEquiet." (*Id.*). On December 28, 2019, Wilson's account was suspended by Twitter. Wilson was informed that his "account has been suspended and will not be restored because [it] was found to be violating Twitter's Terms of Service, specifically the Twitter rules against hateful conduct." (*Id.*).

On January 1, 2020, Wilson elected to create another Twitter account under the username "@Roberte_Wilson." (*Id.* at 5). However, after Wilson completed the "description profile" associated with the new account, but before he had submitted any content under the new username, the account was suspended by Twitter. (*Id.*). Wilson then resolved, "in defiance," to create a third Twitter account, "@AintQuiet." (*Id.*). This account was likewise suspended before Wilson was able to create any content. Wilson did not communicate with Twitter regarding these suspensions, but believed Twitter was "targeting" him. (*Id.*). Wilson then created a fourth and final Twitter account employing the username "@iNotQuiet," and submitted a tweet using "all Caps" that stated, "You will not get this account back!" (ECF No. 2 at 5). Wilson does not reveal whether this account too was suspended by Twitter.

Wilson explains he used his Twitter account to "express my heterosexuality and Christian affiliation," and states that the actions taken by Twitter violated his "rights too [sic] 'free speech and expression.'" (*Id.* at 4). Wilson believes that it is "obvious" Twitter suspended his accounts "because I stand up for/stood up for expressing me/my [sic] heterosexuality." (*Id.* at 4-5). Wilson asserts that this motive is evidenced by Twitter's suspension of his accounts based solely on his "profile description," and before he submitted any content.[1] (*Id.* at 5).

---

[1] Wilson's handwriting is occasionally nearly indecipherable, and the meaning of his complaint is at times difficult to discern. The undersigned has attempted to attach fair meaning to Wilson's assertions to the extent possible.

Wilson asserts that he is bringing his claims pursuant to the "U.S. Constitution, 1st [Amendment,] [the] 1866 Civil Rights Act . . . and [the] 1964 [Civil Rights] Act." (*Id.* at 3). For relief, Wilson seeks 50 million dollars in damages for Twitter's actions which violated his constitutional right to free expression and suppressed his ability to express his "heterosexuality and Christian affiliation." (*Id.* at 4). Wilson additionally seeks 150 million dollars for Twitter's actions in "targeting" him by suspending his accounts. (ECF No. 2 at 6). Wilson asserts that this conduct caused him stress, resulting in raised blood pressure and cholesterol levels, and additionally caused Wilson to engage in "angry outbursts" which "disturbed [his] neighbors." (*Id.*).

Wilson also requests 250 million dollars in damages based on the suspension of his Twitter account due to "actual tweets" he sent, as well the profile description he assigned to the Twitter account.[2] (*Id.*). Wilson describes the nature of this content which included "insults" against public figures such as "Oprah Winfrey/Gayle King/President Obama/Sunny Hostin/Michelle Obama and many more insulted." (*Id.*). Wilson also objects to the suspension of his account based on "insults" he levied against "homosexuality" in general. These insults included the terms "'gayness/Homos/Fagots [sic]/Dykes/Low Down Bi-Bisexuals [sic]/Queer Dogs/Trans Mutants.'" (*Id.*).

On February 24, 2020, Twitter submitted a Motion to Dismiss Complaint and an accompanying memorandum of law in support. (ECF Nos. 14, 15). Twitter presents multiple arguments in favor of dismissal. First, Twitter asserts that Wilson is unable to assert a claim against it under the First Amendment to the United States Constitution

---

[2] It is not entirely clear if Wilson is referring solely to content which was created under the account which was suspended on December 28, 2019, or if he is describing content he submitted under multiple alternative accounts which were also deactivated by Twitter. However, for the purposes of this complaint, this distinction is not material.

("First Amendment") because Twitter is a private entity not subject to the First Amendment's proscription against speech restriction. (ECF No. 15 at 5). Twitter argues that Wilson additionally fails to assert a valid claim under the Civil Rights Act of 1866, 42 U.S.C. § 1981, because he does not allege Twitter discriminated against him based on his race. (*Id.* at 5-6).

As to Wilson's claim under the Civil Rights Act of 1964, Twitter asserts that Wilson fails to allege facts showing religious discrimination under Title II of that Act, and is unable to proceed against Twitter as the company's social media platform is not a "public accommodation" as required to bring a claim under Title II. (*Id.* at 6). Finally, Twitter contends that Wilson's claim is barred as a matter of law because Twitter's conduct in suspending Wilson's accounts is protected under relevant federal law. (*Id.* at 7).

On April 7, 2020, Wilson filed a Response to Twitter's request for dismissal. (ECF No. 19). Wilson objects to a telephone call he received from counsel representing Twitter in which he was asked if he was representing himself in this action, or if he had obtained counsel. (*Id.* at 1). Wilson states counsel for Twitter informed him the question was asked in order to determine if materials related to the case should be sent to Wilson directly, or to the attorney representing his interests. (*Id.*). Wilson asserts that this amounts to "total deception and 'legal abuse.'" (*Id.*). Wilson believes that counsel for Twitter only asked if Wilson was represented by counsel so that they could present a motion to dismiss with "frivolous case references." (*Id.*). Wilson objects to counsel for Twitter's "'snake in tall weeds' tactic" and asks that this Court deny Twitter's "elementary 'Motion to Dismiss.'" (*Id.*). Wilson requests that this Court consider granting 200 million dollars or "at least half" of his requested monetary damages. (*Id.*).

On April 9, 2020 Wilson supplied a Supplemental Response, in which he largely reiterates his claim that counsel for Twitter acted improperly by calling him and by submitting a "frivolous" motion to dismiss. (ECF No. 20 at 1). Wilson believes that counsel for Twitter submitted a legal brief replete with inaccurate assertions of law knowing that Wilson was proceeding *pro se* and would be unable to effectively rebut their incorrect legal citations. (*Id.* at 1-2). Wilson again asks this Court to grant at least half of his requested monetary damages due to the "clear and present danger of 'legal abuse'" presented by Twitter's actions. (*Id.*).

On April 21, 2020, Twitter submitted a Reply in Support of its Motion to Dismiss Wilson's Complaint. (ECF No. 21). Twitter asserts that Wilson "fails to refute, or even address, the Complaint's numerous fatal defects that Twitter detailed in its Motion to Dismiss," and, "instead focuses solely on the baseless allegation that [Twitter's] decision to file this Motion as well as a single conversation with local defense counsel concerning whether he was represented by counsel, constitute 'legal abuse' that compels denial of Twitter's Motion." (*Id.* at 1). Twitter explains that defense counsel contacted Wilson in order to request Wilson's consent to an extension of time for Twitter to submit its response. (*Id.* at 3). Prior to communicating the request, in order to comply with relevant rules regulating attorney conduct, counsel for Twitter asked Wilson if he was in the process of obtaining an attorney, or was planning on proceeding *pro se*. (*Id.*). Wilson denied the request and the conversation ended. (*Id.*).

## II.    **Standard of Review**

Twitter files its motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). A motion under this rule tests the sufficiency of the complaint. *Bell Atlantic Corp v. Twombly*, 550 U.S. 544, 570 (2007) (stating to survive a 12(b)(6) motion, a complaint

must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face"). Accordingly, the Court will assume that the facts alleged in the complaint are true and will draw all reasonable inferences in Wilson's favor, as the nonmoving party. *Burbach Broad. Co. of Delaware v. Elkins Radio Corp.*, 278 F.3d 401, 405-06 (4th Cir. 2002). Because the purpose of Rule 12(b)(6) is limited to assessing the adequacy of a complaint, the court is not "to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (internal quotation omitted). "Furthermore, when as here, a Rule 12(b)(6) motion is testing the sufficiency of a civil rights complaint, 'we must be especially solicitous of the wrongs alleged' and 'must not dismiss the complaint unless it appears to a certainty that the plaintiff would not be entitled to relief *under any legal theory which might plausibly be suggested by the facts alleged.*'" *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999) (quoting *Harrison v. United States Postal Serv.,* 840 F.2d 1149, 1152 (4th Cir. 1988)).

While the Court "take[s] the facts in the light most favorable to the plaintiff, ... [the Court] need not accept the legal conclusions drawn from the facts," and "need not accept as true unwarranted inferences, unreasonable conclusions or arguments." *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008) (quoting *Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000)). A complaint fails to state a claim when, accepting the plaintiff's well-pleaded allegations as true and drawing all reasonable inferences, the complaint lacks "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. A pleading that "offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do" and a complaint will not "suffice if it tenders naked assertions devoid of further factual enhancements."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations and citations omitted).

Courts are required to liberally construe *pro se* complaints, such as the complaint filed herein. *Erickson v. Pardus,* 551 U.S. 89, 94 (2007). However, even under this less stringent standard, the complaint must contain sufficient factual allegations to support a valid legal cause of action. *Bass v. E.I. Dupont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003). The Court may not rewrite the pleading to include claims that were never presented, *Parker v. Champion*, 148 F.3d 1219, 1222 (10th Cir. 1998), construct the plaintiff's legal arguments for him, *Small v. Endicott,* 998 F.2d 411, 417-18 (7th Cir. 1993), or "conjure up questions never squarely presented" to the Court. *Beaudett v. City of Hampton,* 775 F.2d 1274, 1278 (4th Cir. 1985).

## III.  <u>Discussion</u>

Wilson brings his complaint against Twitter, a social media company that has created a platform wherein subscribers to its service may send electronically created messages to the public. After making an account, users may create and publish messages, or "tweets," to the platform. Users may also view, interact with, and reply, to messages posted by other users. *See e.g. Knight First Amendment Inst. at Columbia Univ. v. Trump,* 928 F.3d 226, 230 (2d Cir. 2019). Wilson asserts that his complaint is brought under the First Amendment to the United States Constitution and the Civil Rights Acts of 1866, 42 U.S.C. § 1981, and 1964, 42 U.S.C. § 2000a. (ECF No. 2 at 3). Each of these arguments will be considered in turn.

### A. The First Amendment

The First Amendment states that "Congress shall make no law … abridging the freedom of speech." *See* U.S. Const. amend. I. The constitutional safeguard provided by the free speech clause of the First Amendment "was fashioned to assure unfettered

interchange of ideas for the bringing about of political and social changes desired by the people." *New York Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964) (quotation omitted). "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). The First Amendment has long protected "a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions." *Bridges v. State of Cal.*, 314 U.S. 252, 270 (1941) (footnote omitted).

The First Amendment's proscription against government interference with private speech "constrains governmental actors and protects private actors." *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1926 (2019). It is, accordingly, "a commonplace that the constitutional guarantee of free speech is a guarantee only against abridgment by government, federal or state." *Hudgens v. N.L.R.B.*, 424 U.S. 507, 513 (1976). This means that "while statutory or common law may in some situations extend protection or provide redress against a private corporation or person who seeks to abridge the free expression of others, no such protection or redress is provided by the Constitution itself." *Id.* It is not disputed by Wilson that Twitter is a publicly traded, multi-national corporation and not an arm of federal or state government. (ECF No. 15 at 5).

Under certain circumstances, where the actions of an ostensibly private actor can be "fairly attributed to the State," the private entity may be treated as a "state actor" and forced to comply with the restraints on government action provided by the Constitution. *See Rendell-Baker v. Kohn*, 457 U.S. 830, 839–40 (1982). The Supreme Court of the United States ("Supreme Court") has recently clarified when the state-action doctrine

may apply and reinforced the distinction between government action, which is subject to the free speech clause of the First Amendment, and private conduct which is not. *See Halleck,* 139 S. Ct. at 1930. "[A] private entity may qualify as a state actor when it exercises 'powers traditionally exclusively reserved to the State.'" *Id.* at 1928 (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 352 (1974)). However, "to qualify as a traditional, exclusive public function within the meaning of our state-action precedents, the government must have traditionally *and* exclusively performed the function." *Id.* at 1929 (citations omitted). In, *Halleck,* the Supreme Court concluded that a private entity which operated a public access channel on a cable system was not a state actor, despite pervasive state regulation of the private entity's operation of the public access channel. *Id.* at 1926-27. In so doing, the Supreme Court concluded that, "merely hosting speech by others is not a traditional, exclusive public function and does not alone transform private entities into state actors subject to First Amendment constraints." *Id.* at 1930.

Beyond generalized assertions that Twitter's motion to dismiss contains "frivolous case references" and amounts to "legal abuse," Wilson does not address Twitter's assertion that, as a private entity, it is not constrained by the First Amendment. (ECF No. 20 at 1-2). Even if Wilson were to argue that Twitter is subject to the First Amendment under the state-action doctrine, such an argument would fail. While Twitter no doubt provides a valuable public forum, one in which millions of users, including the President of the United States, participate in wide-ranging public discourse,[3] this alone is insufficient to establish that Twitter is a state actor. Although the ubiquity of the internet, and the unprecedented scale at which social media companies such as Twitter operate,

---

[3] *See Knight First Amendment Inst. at Columbia Univ. v. Trump,* 953 F.3d 216, 217 (2d Cir. 2020).

has resulted in a significant portion of public debate taking place on forums controlled by private actors, the nature of the state-action doctrine remains the same. *See Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 790 (2011) ("[W]hatever the challenges of applying the Constitution to ever-advancing technology, the basic principles of freedom of speech and the press, like the First Amendment's command, do not vary when a new and different medium for communication appears.") (internal quotation omitted); *see also Prager Univ. v. Google LLC*, 951 F.3d 991, 995 (9th Cir. 2020) ("The Internet does not alter [the] state action requirement of the First Amendment.").

The Supreme Court has previously considered First Amendment claims during a similar shift in the sphere of public association, as the rise of private shopping malls and accompanying change in American consumer behavior in the latter-half of the twentieth century resulted in a relative decrease in the centrality as places of public debate of municipally-owned "streets, sidewalks, parks, and other similar public places," which were traditionality closely "associated with the exercise of First Amendment rights." *Hudgens,* 424 U.S. at 515. Nevertheless, the Supreme Court declined to extend the protections of the First Amendment to those distributing leaflets on the private property of a shopping center, despite its similarity to the public forums traditionally associated with the exercise of the First Amendment. *Id.* at 519-521; *see also Lloyd Corp., Ltd. v. Tanner*, 407 U.S. 551, 563-64 (1972). That private social media companies now host platforms which imitate the functions of public forums—in many respects more effectively than the traditional public forums of government-owned sidewalks, streets, and public parks—does not mean that the entities are state-actors for the purposes of the First Amendment. *See Prager*, 951 F.3d at 997 ("YouTube may be a paradigmatic public square on the Internet, but it is 'not transformed' into a state actor solely by 'provid[ing] a forum

for speech.'") (quoting *Halleck*, 139 S. Ct. at 1930, 1934); *see also Davison v. Facebook, Inc.*, 370 F. Supp. 3d 621, 629 (E.D. Va.), *aff'd*, 774 F. App'x 162 (4th Cir. 2019), *cert. denied*, 140 S. Ct. 1111 (2020) ("Under these circumstances, Facebook cannot be deemed a state actor. For that reason, Facebook has, as a private entity, the right to regulate the content of its platforms as it sees fit."); *Freedom Watch, Inc. v. Google, Inc.*, 368 F. Supp. 3d 30, 40 (D.D.C. 2019) ("Facebook and Twitter … are private businesses that do not become 'state actors' based solely on the provision of their social media networks to the public."); *Ebeid v. Facebook, Inc.*, No. 18-CV-07030-PJH, 2019 WL 2059662, at *6 (N.D. Cal. May 9, 2019) ("Because Facebook is a private entity and because plaintiff has failed to show that Facebook should be treated as a state actor, plaintiff has failed to state a First Amendment claim."); *Forbes v. Facebook, Inc.*, 2016 WL 676396, at *2 (E.D.N.Y. Feb. 18, 2016) ("Facebook is a private corporation" whose actions may not "be fairly attributable to the state"); *Langdon v. Google, Inc.*, 474 F. Supp. 2d 622, 631 (D. Del. 2007) ("Defendants are private, for profit [internet search engines], not subject to constitutional free speech guarantees.").

As the Supreme Court has noted, "merely hosting speech by others is not a traditional, exclusive public function and does not alone transform private entities into state actors subject to First Amendment constraints." *Halleck*, 139 S. Ct. at 1930. Thus, the undersigned **FINDS** that Wilson fails to state a plausible First Amendment claim against Twitter because, notwithstanding that it has created a forum for hosting speech, Twitter is a private entity and is not subject to the state-action doctrine.

### B. Section 1981

Wilson asserts that he is bringing this lawsuit under § 1981. (ECF No. 2 at 3). Section 1981 is a "longstanding civil rights law, first enacted just after the Civil War."

*CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 445 (2008). The statute provides that "[a]ll persons within the Jurisdiction of the United States shall have the same right ... to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws ... as is enjoyed by white citizens." 42 U.S.C. § 1981(a). The law further states that "the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Section 1981 thus by its terms prohibits racial discrimination in the making, performance, and termination of contracts. *See Pryor v. United Air Lines, Inc.,* 791 F.3d 488, 496 n.6 (4th Cir. 2015).

Wilson is clearly unable to state a plausible claim for relief under this section as he does not allege that Twitter discriminated against him due to his race. Wilson states his belief that Twitter was biased against him because of his statements in favor of "heterosexuality," as well as his adherence to Christian beliefs, (ECF No. 2 at 4-5); however, nowhere in his complaint does Wilson provide any facts that could conceivably suggest Twitter discriminated against him due to his race. In fact, it is not apparent from Wilson's complaint whether Twitter was even aware of Wilson's race, much less that the decision to suspend his account was based on such knowledge. Twitter pointed to Wilson's failure to provide any details related to his claim of racial discrimination under § 1981 as a valid basis for dismissal of this claim. (ECF No. 15 at 5-6). Wilson responded to Twitter's motion for dismissal, but did not provide any further factual allegations supportive of this claim. (ECF Nos. 19, 20).

As stated, Section 1981 applies only to claims of discrimination based on race. *See Nnadozie v. Genesis HealthCare Corp.*, 730 F. App'x 151, 157 (4th Cir. 2018) ("However,

12

at the very least, a Section 1981 claim must allege *race*-based discrimination.") (unpublished); *see also Morey v. Carroll Cty., Gov't*, No. CV ELH-17-2250, 2018 WL 2064782, at *14 n.6 (D. Md. May 3, 2018) ("These allegations, however, fall outside of the scope of § 1981, and will not be considered in connection with this claim, because they do not involve discrimination based on race."); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1052 (8th Cir. 2011) (claim that alleged discrimination was based on national origin rather than race not cognizable under § 1981) (*en banc*); *El-Zabet v. Nissan N. Am., Inc.*, 211 F. App'x 460, 462 (6th Cir. 2006) ("[The plaintiff] alleged only discrimination based on national origin, while Section 1981 prohibits only discrimination based on race."). Given that Wilson fails to allege any facts inferring that Twitter discriminated against him based on his race, the undersigned **FINDS** that this claim cannot withstand a Rule 12(b)(6) motion to dismiss.

### C. The Civil Rights Act of 1964

Wilson asserts that he is bringing this lawsuit under the "1964 C.R. Act," presumably the Civil Rights Act of 1964 ("CRA"). (ECF No. 2 at 3). The CRA was enacted "to prevent ... discrimination in voting, as well as in places of accommodation and public facilities, federally secured programs and in employment." *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 246 (1964). Wilson does not assert under which provision of the CRA he brings his claim, but granting his complaint the liberal construction afforded to *pro se* litigants, he alleges a violation of Title II of the Act, codified as 42 U.S.C. § 2000a. Title II entitles all individuals "to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation ... without discrimination or segregation on the ground of race, color, religion, or national origin." 42 U.S.C. § 2000a(a).

13

**1. Public Accommodation**

Twitter first argues that Wilson is unable to bring a claim alleging a violation of Title II because Twitter is not appropriately considered a place of "public accommodation." (ECF No. 15 at 6-7). Title II defines a "place of public accommodation" as:

> (1) any inn, hotel, motel, or other establishment which provides lodging to transient guests, other than an establishment located within a building which contains not more than five rooms for rent or hire and which is actually occupied by the proprietor of such establishment as his residence;
>
> (2) any restaurant, cafeteria, lunchroom, lunch counter, soda fountain, or other facility principally engaged in selling food for consumption on the premises, including, but not limited to, any such facility located on the premises of any retail establishment; or any gasoline station;
>
> (3) any motion picture house, theater, concert hall, sports arena, stadium or other place of exhibition or entertainment; and
>
> (4) any establishment (A)(i) which is physically located within the premises of any establishment otherwise covered by this subsection, or (ii) within the premises of which is physically located any such covered establishment, and (B) which holds itself out as serving patrons of such covered establishment.

42 U.S.C. § 2000a(b). "Whether an entity qualifies as a 'place of public accommodation' can be a fact-intensive inquiry, because establishments 'differ markedly in their operations.'" *Denny v. Elizabeth Arden Salons, Inc.*, 456 F.3d 427, 431 (4th Cir. 2006) (quoting *Nesmith v. YMCA of Raleigh*, N.C., 397 F.2d 96, 98 (4th Cir.1968)). Twitter is correct that a number of courts have concluded that companies which provide online services exclusively do not fall under the ambit of Title II's prohibition against discrimination in places of "public accommodation" as that definition is limited to businesses which operate out of physical facilities. *See e.g. Noah v. AOL Time Warner, Inc.,* 261 F. Supp. 2d 532, 541 (E.D. Va. 2003), *aff'd*, No. 03-1770, 2004 WL 602711 (4th Cir. Mar. 24, 2004) ("[A]s the relevant case law and an examination the statute's

exhaustive definition make clear, 'places of public accommodation' are limited to actual, physical places and structures, and thus cannot include chat rooms, which are not actual physical facilities but instead are virtual forums for communication provided by AOL to its members."); *see also Ebeid,* No. 18-CV-07030-PJH, 2019 WL 2059662, at *6 ("Facebook is not a public accommodation covered by Title II.").

This conclusion is not universal, however. Title III of the Americans with Disabilities Act ("ADA") grants to individuals with disabilities protection against discrimination in places of "public accommodation," similar to that contained in Title II of the CRA.[4] *See* 42 U.S.C. § 12182(a). The circuits are currently divided over whether the protections provided by the ADA apply only to concrete physical places, or also require accommodations allowing disabled individuals to access services offered virtually via the internet. *Compare Peoples v. Discover Financial Services, Inc.*, 387 Fed.Appx. 179, 183 (3d Cir. 2010) ("Our court is among those that have taken the position that the term [public accommodation] is limited to physical accommodations."); *Parker v. Metro. Life Ins. Co.*, 121 F.3d 1006, 1010–11 (6th Cir. 1997) (*en banc* ) ("As is evident by § 12187(7), a

---

[4] Courts have recognized that, while similar, the definitions of places of "public accommodation" as contained in the ADA and Title II of the CRA are not identical. *See Ramirez v. Petrillo*, No. 3:12-CV-01472-ST, 2012 WL 12887630, at *2 (D. Or. Sept. 19, 2012), *aff'd*, 559 F. App'x 651 (9th Cir. 2014) ("[T]he ADA has a 'more expansive definition of 'place of public accommodation," than the Civil Rights Act." (quoting *Noah*, 261 F. Supp. at 543 n.9); *see also Bowers v. Nat'l Collegiate Athletic Ass'n*, 9 F. Supp. 2d 460, 484 (D.N.J. 1998). Nevertheless, courts, including the Supreme Court, have found analysis of the scope of coverage provided by one law to be instructive for the other. *See PGA Tour, Inc. v. Martin*, 532 U.S. 661, 681 (2001) ("Our conclusion is consistent with case law in the analogous context of Title II of the Civil Rights Act of 1964."); *Ganden v. Nat'l Collegiate Athletic Ass'n*, No. 96 C 6953, 1996 WL 680000, at *9 n.7 (N.D. Ill. Nov. 21, 1996) ("In addition, [the CRA's] definition of 'place of public accommodation" is almost identical to the ADA's definition."); *Elitt v. U.S.A. Hockey*, 922 F. Supp. 217, 223 (E.D. Mo. 1996) (holding that it was appropriate to "apply[] Title II caselaw as persuasive authority," in ADA context); *Staley v. Nat'l Capital Area Council, Boy Scouts of Am.*, No. RWT 10CV2768, 2011 WL 2416724, at *9 (D. Md. June 9, 2011) ( recognizing that "[t]he list of public accommodations outlined in ... the ADA is broader than that contained in Title II of the Civil Rights Act," but nevertheless finding analysis of the CRA to be persuasive with respect to the ADA's scope of coverage); *Ford v. Schering-Plough Corp.*, 145 F.3d 601, 613 (3d Cir. 1998) (finding that interpretation of "place of public accommodation" as defined by ADA was supported by being "in keeping with jurisprudence concerning Title II of the Civil Rights Act of 1964").

public accommodation is a physical place and this Court has previously so held."); *with Carparts Distribution Center., Inc. v. Automotive Wholesaler's Ass'n of New England, Inc.*, 37 F.3d 12, 19–20 (1st Cir. 1994) ("[To] limit the application of Title III to physical structures which persons must enter to obtain goods and services would run afoul of the purposes of the ADA and would severely frustrate Congress's intent that individuals with disabilities fully enjoy the goods, services, privileges and advantages, available indiscriminately to other members of the general public."); *Doe v. Mutual of Omaha Insurance Co.*, 179 F.3d 557, 559 (7th Cir. 1999) ("[T]he owner or operator of a store ... or other facility whether in physical space or in electronic space, that is open to the public cannot exclude disabled persons from entering the facility and, once in, from using the facility in the same way that the nondisabled do.") (internal citation omitted); *Nat'l Ass'n of the Deaf v. Netflix, Inc.,* 869 F. Supp. 2d 196, 202 (D. Mass. 2012) (finding that online video streaming service was place of public accommodation); *Access Now, Inc. v. Blue Apron*, LLC, No. 17-CV-116-JL, 2017 WL 5186354, at *3 (D.N.H. Nov. 8, 2017) ("In a society in which business is increasingly conducted online, excluding businesses that sell services through the Internet from the ADA would run afoul of the purposes of the ADA[.]") (quotation omitted); *Andrews v. Blick Art Materials*, LLC, 268 F.Supp.3d 381, 388-393 (E.D.N.Y. 2017) (describing circuit split).

The United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") has not directly addressed this issue, either under the ADA or the CRA, but has "affirmed in an unpublished opinion that under Title II of the Civil Rights Act, 'chat rooms and other online services do not constitute a place of public accommodation.'" *Carroll v. Nw. Fed. Credit Union*, No. 1:17-CV-01205, 2018 WL 2933407, at *2 (E.D. Va. Jan. 26, 2018) (citing *Noah,* 261 F. Supp. at 540). The Supreme Court has also declined to weigh in on this issue.

*See Robles v. Domino's Pizza*, LLC, 913 F.3d 898, 905 (9th Cir.), *cert. denied*, 140 S. Ct. 122 (2019) (declining to review Ninth Circuit's holding that pizza retailer's website was subject to the ADA). Nonetheless, a recent decision issued by the Supreme Court sheds some light on the distinction between physical places and virtual services crucial to the split between circuits on this issue.

In *South Dakota v. Wayfair, Inc.*, the Supreme Court overruled its earlier precedent, stemming from a 1992 decision, which had held that states could not require out-of-state retailers to collect and remit sales taxes on sales made within the state unless the retailer in question "maintained a physical presence" within the state. *See* 138 S. Ct. 2080, 2091 (2018) (overruling *Quill Corp. v. N. Dakota By & Through Heitkamp*, 504 U.S. 298, 301 (1992)). In so doing, the *Wayfair* Court derided the physical presence rule as one that imposed an "arbitrary, formalistic distinction," and indicated a desire to fashion a rule "appropriate to the twenty-first century, not the nineteenth." *Id.* at 2092 (quotation omitted). The Supreme Court noted that "[m]odern e-commerce does not align analytically with a test that relies on the sort of physical presence defined by *Quill*," and that the physical presence rule distinguished between a small retailer with a physical in-state presence, and a large internet behemoth with pervasive digital sales, but no physical presence in-state, in a way that "simply makes no sense." *Id.* at 2094-95. The Supreme Court criticized *Quill's* overly formal distinction between traditional physical presence, and "the continuous and pervasive virtual presence of retailers today," and held that a business' virtual presence in a state could provide a sufficient nexus to allow the state to impose tax requirements. *Id.* at 2095. While the analysis applied by the *Wayfair* Court was directed at the Commerce Clause, and not toward the distinction between physical places and internet services considered by courts looking at Title II of the CRA, the

Supreme Court's clear directive that artificial distinctions between "virtual" and "physical" commerce erected during the early years of the internet should not be maintained after modern developments render their justification untenable is instructive on this issue.

Twitter asks this Court to hold that, as a provider of internet services, it is not a "public accommodation," and thus is not subject to Title II's directive that private entities refrain from discriminating on the basis of race and other protected classes. (ECF No. 15 at 6-7). Twitter points to *Noah v. AOL Time Warner, Inc.*, a 2004 decision from the District Court for the Eastern District of Virginia, in support of this argument. (*Id.*). In *Noah*, the district court considered whether the plaintiff could bring a discrimination claim under Title II of the CRA based on America Online, Inc. ("AOL's") alleged failure to protect him from discrimination on the basis of his religion within electronic "chat rooms" provided by AOL. *See* 261 F. Supp. at 534-36.

The district court in *Noah* dismissed the plaintiff's complaint because, among other reasons, it determined that an electronic chat room was not a "place of public accommodation" under Title II of the CRA. *Id.* at 539. The *Noah* Court based this determination on the fact that Title II's definition of places of "public accommodation" is "limited to actual, physical places and structures, and thus cannot include chat rooms, which are not actual physical facilities but instead are virtual forums for communication provided by AOL to its members." *Id.* at 541. The *Noah* Court concluded that, based on this definition, "the reach of Title II, however broad, cannot extend beyond actual physical facilities." *Id.* at 542. Since that decision, as pointed out by Twitter, several courts in this circuit have cited to *Noah* favorably in reaching similar conclusion. *See Carroll v. FedFin. Fed. Credit Union*, 324 F. Supp. 3d 658, 666 n.2 (E.D. Va. 2018) (finding that the *Noah*

18

Court's reasoning applied in ADA context); *Stanford v. Halloway*, No. 16-cv-1355, 2017 WL 1048257, at *3 (D. Md. Mar. 20, 2017) (citing to *Noah* for proposition that membership in organization without access to physical facility was not subject to Title II).

However, as detailed above, there is a growing recognition among the circuits that, in the analogous context of ADA discrimination claims, the remedial purpose of the federal civil rights statutes would be thwarted if courts were to continue adhering to a rigid distinction between virtual and physical commerce given the rapid modern expansion of virtual commerce and association. *See e.g. Nat'l Fed'n of the Blind v. Scribd Inc.,* 97 F. Supp. 3d 565, 575 (D. Vt. 2015) ("Now that the Internet plays such a critical role in the personal and professional lives of Americans, excluding disabled persons from access to covered entities that use it as their principal means of reaching the public would defeat the purpose of this important civil rights legislation."). Similarly, courts confronting this question recently have expressed concern that exempting internet services from Title II's protections entirely would conflict with "the need to construe Title II broadly, in light of its purpose," and render large swaths of the economy and places of public association immune to the protections provided by the CRA. *See Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.,* 406 F. Supp. 3d 1258, 1297 (M.D. Ala. 2019).

The "overriding purpose" of Title II of the CRA is to eliminate "the daily affront and humiliation involved in discriminatory denials of access to facilities ostensibly open to the general public." *Daniel v. Paul*, 395 U.S. 298, 307-08 (1969). "Title II of the Civil Rights Act is to be liberally construed and broadly read" in order to effectuate its mandate of eliminating discrimination in public facilities. *Miller v. Amusement Enterprises, Inc.*, 394 F.2d 342, 349 (5th Cir. 1968). *Noah*, the case that most thoroughly examined this issue in this circuit was decided in 2004, when the commercial and social potential of

internet services was still nascent.[5] The Supreme Court has recently, albeit in a different context, admonished against maintaining artificial distinctions between "physical" and "virtual" commerce as the pervasive reach of the internet continues to alter how individuals conduct business and associate with one another. *See Wayfair,* 138 S. Ct. at 2092. Given the massive restructuring of both the economy and public association effectuated by the rise of online platforms and business since the *Noah* decision was issued, drawing an inflexible distinction between physical facilities which can appropriately be considered places of public accommodation, and virtual services and platforms which cannot, appears increasingly tenuous. Online websites and services such as Twitter are, like their physical counterparts, "ostensibly open to the general public," and it increasingly appears that cordoning off virtual services from the protection of Title II would undermine the broad protections provided by the CRA as more and more services and economic opportunities migrate to virtual spaces. *See Daniel*, 395 U.S. at 307-08 .

Ultimately, the undersigned **FINDS** that the Court need not affirmatively resolve this question because, even assuming that Twitter appropriately could be considered a "place of public accommodation" subject to the protections of Title II, Wilson's claim under the CRA is subject to dismissal for other reasons. *See Coral Ridge Ministries,* 406 F. Supp. 3d at 1296-97.

---

[5] The change that has occurred in internet services since that opinion was issued can, in part, be seen by the *Noah* Court's statement that AOL was at that time "the world's largest Internet service provider, with more than 30 million subscribers, or 'members,' worldwide." 261 F.Supp.2d at 534. Clearly, AOL's domination of the internet service market is now a thing of the past, and a number of internet social media empires have risen and fallen since the heyday of AOL. *See e.g. AOL's History of Growth and Decline,* New York Times Dealbook, May 12, 2015, https://www.nytimes.com/interactive/2015/05/12/business/dealbook/aol-timeline.html#/#time372_10952.

## 2. Nature of relief requested

As an initial matter, although not raised by Twitter, Wilson's complaint fails to request any form of relief which can be granted under the CRA. Wilson requests only monetary damages for relief. (ECF No. 2 at 4, 6). In his responses to Twitter's motion to dismiss, Wilson asserts that he would be willing to concede to receiving half of the amount he initially requested, but provides no indication that he is seeking any form of relief beyond monetary damages. (ECF Nos. 19 at 1-2, 20 at 2).

"The only relief available under Title II [of the CRA] is injunctive relief." *Acey v. Bob Evans Farms, Inc.*, No. 2:13-CV-04916, 2014 WL 989201, at *7 (S.D.W. Va. Mar. 13, 2014) (citation omitted). While the CRA does permit an individual to bring a private lawsuit enforcing Title II of the Act, "[w]hen a plaintiff brings an action under that Title, he cannot recover damages." *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402 (1968). Accordingly, when a plaintiff brings a complaint under Title II which seeks only monetary damages, courts in this Circuit have found the complaint should be dismissed. *See Acey*, No. 2:13-CV-04916, 2014 WL 989201, at *7-8 (citing *Gennell v. Denny's Corp.*, 378 F.Supp.2d 551, 556 (D. Md. 2005)); *see also Levy v. Denny's Corp.*, No. 7:13-CV-00565-MGL, 2013 WL 5596925, at *6 (D.S.C. Oct. 11, 2013) ("The plaintiff's public accommodation claim under Title III of the ADA and her claim under Title II of the Civil Rights Act of 1964 should be dismissed for failure to pray for equitable relief, which is the only remedy available under either claim."); *Rychenko v. Burnette*, No. 1:16-CV-00214-MR-DSC, 2017 WL 130001, at *2 (W.D.N.C. Jan. 12, 2017), *report and recommendation adopted*, No. 1:16-CV-00214-MR-DSC, 2017 WL 872650 (W.D.N.C. Mar. 3, 2017) ("[The plaintiff's] claim under Title II should be dismissed because he has sought monetary damages when only injunctive relief is available under the statute.").

Therefore, as Wilson seeks only monetary damages, the undersigned **FINDS** that his claim under Title II of the CRA should be dismissed.

### 3. Section 230

Twitter asserts that Wilson's claim that his account was inappropriately terminated is barred by the operation of Section 230 of the Communications Decency Act ("CDA"), codified as 47 U.S.C. § 230. (ECF No. 15 at 7). The Fourth Circuit has explained that in enacting the CDA, "Congress carved out a sphere of immunity from state lawsuits for providers of interactive computer services to preserve the 'vibrant and competitive free market' of ideas on the Internet." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254 (4th Cir. 2009) (quoting 47 U.S.C. § 230(b)(2)). To effectuate the CDA's purposes, "courts have generally accorded [Section] 230 immunity a broad scope." *Id.* The CDA "established a general rule that providers of interactive computer services are liable only for speech that is properly attributable to them." *Id.* (citing *Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 419 (1st Cir.2007)).

Section 230 provides, in relevant part, that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). The Fourth Circuit has recognized that, "[b]y its plain language," this provision of the CDA, "creates a federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service." *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997). The practical effect of the immunity, "precludes courts from entertaining claims that would place a computer service provider in a publisher's role." *Id.* Meaning, "lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish,

withdraw, postpone or alter content—are barred." *Id.* The Fourth Circuit recognized that an ancillary goal of the legislation was to "encourage service providers to self-regulate the dissemination of offensive material over their services," by granting them immunity from material published by third parties regardless of whether the interactive computer service provider took an active role in regulating the content therein. *Id.* at 331. Accordingly, "§ 230 forbids the imposition of publisher liability on a service provider for the exercise of its editorial and self-regulatory functions." *Id.*

To determine if Section 230 immunity attaches, a court must investigate: "1) whether Defendant is a provider of an interactive computer service; 2) if the postings at issue are information provided by another information content provider; and 3) whether [the plaintiff's] claims seek to treat [the defendant] as a publisher or speaker of third party content." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 564 F. Supp. 2d 544, 548 (E.D. Va. 2008), *aff'd*, 591 F.3d 250 (4th Cir. 2009).

*i.) Interactive computer service*

The CDA "broadly defines 'interactive computer service' as 'any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server.'" *Jefferson v. Zukerberg*, No. CV RDB-17-3299, 2018 WL 3241343, at *5 (D. Md. July 3, 2018) (quoting 47 U.S.C. § 230(f)(2)). The "prototypical service qualifying for this statutory immunity [under § 230(c)(1) ] is an online messaging board (or bulletin board) on which Internet subscribers post comments and respond to comments posted by others." *Hare v. Richie*, No. CIV. ELH-11-3488, 2012 WL 3773116, at *15 (D. Md. Aug. 29, 2012) (quoting *FTC v. Accusearch, Inc.*, 570 F.3d 1187, 1195 (10th Cir.2009)). Wilson does not dispute that Twitter is an "interactive computer service" within the meaning of the statute. Indeed, Twitter provides the "prototypical service"

entitling it to the protections of this statute, as it provides a forum for individuals to post comments, (or "tweets," to give them their *nom de guerre*), to which others may then respond. *Id.* Other courts to consider the question have also found that Twitter qualifies as an interactive computer service. *See Mezey v. Twitter, Inc.,* No. 1:18-CV-21069-KMM, 2018 WL 5306769, at *1 (S.D. Fla. July 19, 2018) ("First, Twitter—as a platform that transmits, receives, displays, organizes, and hosts content—is an interactive computer service."); *see also Am. Freedom Defense Initiative v. Lynch*, 217 F.Supp. 3d 100, 104 (D. D.C. 2016) (finding that Twitter is interactive computer service under the CDA); *Brittain v. Twitter, Inc.*, No. 19-CV-00114-YGR, 2019 WL 2423375, at *2 (N.D. Cal. June 10, 2019) ("The Court finds that Twitter qualifies as an interactive computer service.").

　　*ii.) Information provided by another content provider*

　　It is clear that the information at issue here, Wilson's posts and Twitter accounts, meets the second prong of this test. An "information content provider" is defined as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3). The term "another information content provider" refers to any content not provided by the interactive computer service provider itself. *See Batzel v. Smith*, 333 F.3d 1018, 1031 (9th Cir. 2003) ("The reference to *'another* information content provider' ... distinguishes the circumstance in which the interactive computer service itself meets the definition of 'information content provider' with respect to the information in question."). This means Twitter would not be immune from suit under this statute for content Twitter itself created and published directly, but is immune from lawsuits stemming from content provided by other individuals which Twitter hosts on its platform. *See Sikhs for Justice, Inc. v. Facebook, Inc.*, 144 F. Supp. 3d 1088, 1094 (N.D.

Cal. 2015), *aff'd*, 697 F. App'x 526 (9th Cir. 2017) ("In other words, the CDA immunizes an interactive computer service provider that passively displays content that is created entirely by third parties, but not an interactive computer service provider that acts as an information content provider by creating or developing the content at issue."). Accordingly, the content at issue in this case was provided by "another information content provider," *i.e. not* Twitter, given that it was provided by Wilson himself.

### iii.) Treating Twitter as a speaker or publisher

Lastly, Wilson is clearly attempting to hold Twitter liable as a publisher or speaker. The Fourth Circuit has recognized that § 230 intended to immunize interactive computer service providers where they exercised "a publisher's traditional editorial functions" while hosting the content of others. *Zeran,* 129 F.3d at 330. This includes "deciding whether to publish, withdraw, postpone or alter content." *Id.* Wilson seeks to hold Twitter liable for its decision to delete his posts and terminate (or withdraw) his account. (ECF No. 2 at 4). As Twitter's decision to suspend Wilson's accounts, based on tweets that reportedly used derogatory slurs for homosexuality, was reached in the course of a traditional editorial function—namely deciding what type of content to publish—Wilson's claim is precluded by application of § 230(c)(1) of the CDA. While this case does not represent the "typical" case envisioned by § 230 immunity, wherein a litigant seeks to hold an interactive computer service provider liable for publishing content from a third-party which the litigant finds objectionable, courts have readily found that the statutory immunity also applies to the factual scenario presented here, where the plaintiff objects to the removal of his or her own content. *See Domen v. Vimeo, Inc.*, No. 1:19-CV-08418 (SDA), 2020 WL 217048, at *6 (S.D.N.Y. Jan. 15, 2020); ("In this case, Vimeo plainly was acting as a 'publisher' when it deleted (or, in other words, withdrew) [the plaintiffs'] content on the

Vimeo website."); *see also Mezey*, No. 18-CV-21069 (KMM), 2018 WL 5306769, at *2 (dismissing lawsuit claiming that Twitter "unlawfully suspended [the plaintiff's] Twitter account" on grounds of Section 230(c)(1) immunity); *Riggs v. MySpace, Inc.*, 444 F. App'x 986, 987 (9th Cir. 2011) (Section 230 immunity applied to claims "arising from MySpace's decisions to delete [the plaintiff's] user profiles on its social networking website yet not delete other profiles…"); *Hare v. Richie*, No. CIV. ELH-11-3488, 2012 WL 3773116, at *15 (D. Md. Aug. 29, 2012) ("[L]awsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content—are barred. It is immaterial whether this decision comes in the form of deciding what to publish in the first place or what to remove among the published material.") (internal quotations omitted); *Ebeid*, No. 18-CV-07030-PJH, 2019 WL 2059662, at *5 (decision to suspend the plaintiff's Facebook account was traditional editorial function and thus protected by § 230); *Lancaster v. Alphabet Inc.*, No. 15-CV-05299 (HSG), 2016 WL 3648608 at *3 (N.D. Cal. July 8, 2016) (applying Section 230 (c)(1) immunity to the decision by YouTube, LLC, to remove the plaintiff's YouTube videos); *Bennett v. Google*, LLC, 882 F.3d 1163, 1167 (D.C. Cir. 2018) ("[T]he very essence of publishing is making the decision whether to print or retract a given piece of content.") (quotation omitted); *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1170–71 (9th Cir. 2008) ("[A]ny activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230.").

Notably, the CDA expressly excludes only four classes of claims from its broad grant of immunity. These include, claims involving a "Federal criminal statute," "any law pertaining to intellectual property," "any State law that is consistent with this section,"

and "the Electronic Communications Privacy Act." *See* 47 U.S.C. § 230(e)(1)-(4). Claims brought pursuant to federal civil rights statutes, such as Title II of the CRA, are not exempted from the immunity provided by the CDA. *See Noah,* 261 F. Supp. at 539 ("First, [the plaintiff] argues that § 230 immunity does not apply to claims brought under federal civil rights statutes. Yet, this argument runs counter to § 230's expansive language, which plainly reaches such claims."); *see also Sikhs for Justice, Inc. v. Facebook, Inc.*, 697 Fed. App'x. 526, 526 (9th Cir. 2017) ("[W]e have found no authority, and [the plaintiff] fails to cite any authority, holding that Title II of the [CRA] provides an exception to the immunity afforded to [the defendant] under the CDA."); *Nat'l Ass'n of the Deaf v. Harvard Univ.*, 377 F. Supp. 3d 49, 66 (D. Mass. 2019) ("The CDA exempts certain laws from its reach. Federal and state antidiscrimination statutes are not exempted."); *Chicago Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666, 671 (7th Cir. 2008) (finding that CDA barred claim brought under the Fair Housing Act). Consequently, the undersigned **FINDS** that Wilson's claim that Twitter improperly revoked his accounts under Title II of the CRA is barred by federal law.

### 4. Failure to state a claim

Twitter asserts that Wilson "provides no plausible factual allegation that Twitter had a discriminatory purpose" in suspending his accounts, and that his complaint must be dismissed accordingly. (ECF No. 15 at 7). Wilson claims two potential discriminatory motives for Twitter's suspension of his accounts. First, he alleges that his participation in Twitter was terminated based on his "heterosexuality" and the fact that he "stood up for expressing me/my [sic] heterosexuality." (ECF No 2 at 5). Second, Wilson contends that he was barred by Twitter because he expressed his "Christian affiliation." (*Id.* at 4).

27

*i.) Heterosexuality*

As noted, the CRA protects against discrimination in the enjoyment of "goods, services, facilities, privileges, advantages, and accommodations" provided by "any place of public accommodation ... on the ground of race, color, religion, or national origin." 42 U.S.C. § 2000a(a). Read generously, Wilson's complaint can be seen as asserting a claim that he was denied access to Twitter's services on the basis of his sexual orientation, and statements he made in support thereof. (ECF No. 2 at 4-5). However, the CRA only protects against discrimination in places of public accommodation on the basis of an individual's "race, color, religion or national origin." 42 U.S.C. § 2000a(a). Title II does not prohibit discrimination on the basis of sex or sexual orientation.[6] As Wilson's "heterosexuality" is not recognized as a protected class for the purposes of Title II of the CRA, the undersigned **FINDS** that he fails to state a claim against Twitter for allegedly discriminating against him based on his heterosexual orientation. *See Armstrong v. James Madison Univ.,* No. 5:16-CV-00053, 2017 WL 2390234, at *6 (W.D. Va. Feb. 23, 2017), *report and recommendation adopted*, No. 5:16-CV-53, 2017 WL 2399338 (W.D. Va. June 1, 2017) ("Thus, [the plaintiff's] allegations of discrimination based on his age and sex are not properly brought under Title II.") (collecting cases).

*ii.) Religion*

Title II of the CRA prohibits places of public accommodation from discriminating

---

[6] Title VII of the CRA does prohibit discrimination in employment practices on the basis of "sex."42 U.S.C. § 2000e-2(a)(1)-(2). Wilson's complaint does not allege any facts which suggest he could proceed under this Title. Moreover, while Title VII prohibits discrimination on the basis of "sex," the circuits are currently divided over whether that protection extends to one's sexual orientation. The issue is currently pending before the Supreme Court, *See Altitude Exp., Inc. v. Zarda*, 139 S. Ct. 1599 (2019). However, as the law currently stands in this Circuit, Wilson would be unable to proceed with a claim under Title VII based on his sexual orientation even if his complaint did allege discrimination in the context of employment. *See Hinton v. Virginia Union Univ.*, 185 F. Supp. 3d 807, 814 (E.D. Va. 2016) ("It is explicitly the law of the Fourth Circuit that Title VII does not protect against discrimination based on sexual orientation.") (citing *Murray v. N. Carolina Dep't of Pub. Safety*, 611 Fed.Appx. 166 (4th Cir.2015)).

against individuals on the basis of their religion. 42 U.S.C. § 2000a(a). Wilson asserts that Twitter wrongfully suspended his account based on his "Christian affiliation." (ECF No. 2 at 4). However, Wilson provides no facts in support of this statement. To the extent that Wilson does provide facts related to the suspension of his accounts, these facts revolve around his stance on heterosexuality and homosexuality. (*Id.* at 5). Beyond the bare, conclusory assertion that his account was suspended because of his "Christian affiliation," Wilson provides no allegations corroborating his belief that he was discriminated against based on his religion. Wilson explains that his account was suspended after he deployed "insults" against various public figures and against homosexuality broadly. (*Id.* at 6). The insults took the form of various derogatory terms such as "'gayness/Homos/Fagots [sic]/Dykes/Low Down Bi-Bisexuals [sic]/Queer Dogs/Trans Mutants.'" (*Id.*). Taking Wilson at his word, these tweets did not explicitly refer to his Christian beliefs and were not posted primarily as a way to promote Christianity as a religion.

Although considering discrimination on the basis of religion in the employment context under Title VII, rather than in the context of a place of public accommodation under Title II, the Fourth Circuit decision in *Chalmers v. Tulon Company of Richmond*, is instructive. *See* 101 F.3d 1012 (4th Cir. 1996). There, the Fourth Circuit considered whether a business had discriminated against its employee when it fired her after she sent various letters to other employees criticizing their "immoral" conduct and lifestyles. *Id.* at 1021. The Fourth Circuit concluded it had not, because, among other reasons, the plaintiff failed to demonstrate that she had notified the company it was her sincere religious beliefs which compelled her to send the letters to other employees. *Id.* This requirement is necessary because "[i]f an employer has not been given adequate notice of an employee's religious conflict, then *ipso facto* the religious animus that the statute was designed to

prevent cannot have existed." *Cary v. Carmichael*, 908 F. Supp. 1334, 1344 (E.D. Va. 1995), *aff'd sub nom. Cary v. Anheuser-Busch, Inc.*, 116 F.3d 472 (4th Cir. 1997).

As in the context of employment discrimination claims under Title VII, in order to demonstrate a claim of religious discrimination in a place of public accommodation under Title II, Wilson must show that Twitter was both aware of his religious beliefs, and discriminated against him *on the basis of* those religious beliefs. *Akiyama v. U.S. Judo Inc.*, 181 F. Supp. 2d 1179, 1187 (W.D. Wash. 2002) ("Absent some evidence that the regulation was aimed at a particular religious belief and/or that the proprietor adopted the regulation as a pretext for intentional discrimination on the basis of religion, Title II is not implicated."); *Bormuth v. Dahlem Conservancy*, 837 F. Supp. 2d 667, 674 (E.D. Mich. 2011) ("[T]o prove the claim, plaintiff would have to demonstrate that he was denied a public accommodation because of his religion."); *Armstrong*, No. 5:16-CV-00053, 2017 WL 2390234, at *6; *Bellamy v. Finn McCool's Bar*, No. 418CV01636JMCKDW, 2018 WL 6113001, at *3 (D.S.C. Aug. 3, 2018), *report and recommendation adopted*, No. 4:18-CV-01636-JMC, 2018 WL 4767241 (D.S.C. Oct. 3, 2018) ("Where a plaintiff fails to allege facts that would reasonably support a finding of intentional discrimination, courts have dismissed the plaintiff's claim.") (Section 1981 claim). Reading Wilson's complaint liberally, it may be construed as putting forth the argument that he spoke out in favor of heterosexuality, and in opposition to homosexuality, because of his religious beliefs. However, he fails to provide any indication that the tweets alerted Twitter to the fact that he was deploying the offensive language he used as an expression of his religious beliefs. Moreover, Wilson provides no allegations upon which the Court could reasonably conclude that mainstream Christians, or Christian-based religions, sanction and encourage the use of derogatory labels. Wilson's

complaint leaves no doubt that his account was suspended due to his violation of Twitter's Terms of Service that govern users' conduct; specifically, the rule prohibiting "hateful conduct." (ECF No. 2 at 4).[7]

Twitter's policy prohibiting hateful conduct is facially neutral, and there is no evidence apparent from the record that Twitter applied this policy to Wilson's tweets in a discriminatory manner. While Wilson fails to provide the verbatim content of his tweets and the "profile descriptions" that led to his accounts' suspension, he does admit that he used Twitter's platform to levy "insults" against various public figures and against homosexuality in general. (ECF No. 2 at 6). The "insults" Wilson deployed consisted of numerous slurs and derogatory terms for individuals of different sexual orientation and gender identity. (*Id.*).

Under these circumstances, Wilson fails to allege that Twitter acted in a discriminatory manner by suspending his accounts and prohibiting him from utilizing its platform to hurl insults at others. Wilson does not allege that Twitter was even aware of any religious motivation behind the conduct for which he was suspended, much less that Twitter sanctioned him because of his religious motivation, rather than offensive content itself. The facts contained in Wilson's complaint simply do not lay out a plausible factual claim that Twitter's actions in suspending his accounts were motivated by religious animus, rather than representing Twitter's neutral enforcement of its rules prohibiting harassment on its platform. In other words, assuming that Wilson's assertion he was

---

[7] Neither Wilson, nor counsel for Twitter, provided Twitter's User Agreement. The current version of Twitter's User Agreement states that users are not permitted to "promote violence against, threaten, or harass other people on the basis of race, ethnicity, national origin, sexual orientation, gender, gender identity, religious affiliation, age, disability, or serious disease." *See https://cdn.cms-twdigitalassets.com/content/dam/legal-twitter/site-assets/privacy-policy-new/Twitter-User-agreement-EN.pdf*

compelled to create tweets denigrating homosexuality and its practitioners because of a sincerely held religious belief is true, and assuming that his account was suspended due to the content of those tweets is also true, he has not successfully established that Twitter targeted him *because of* his religious beliefs, rather than because of the content of the tweets themselves.

Tweets which use offensive language to insult individuals based on their sexual orientation are prohibited by Twitter regardless of whether those tweets are motivated by religious or secular beliefs. Therefore, even if Wilson was driven by his religious beliefs to create content which Twitter found to be in violation of its policy, his personal motivation does not bar Twitter from enforcing its generally applicable rules regarding user conduct. *See Coral Ridge Ministries,* 406 F. Supp. 3d at 1306 ("Yet, the fact that [the plaintiff's] opposition to homosexual conduct happens to be rooted in its *religious* beliefs does not mean that [the defendant] targeted [the plaintiff] because of its religious beliefs, as opposed to its belief, full stop, regardless of whether that belief is religiously rooted."); *see also Fall v. LA Fitness,* 161 F. Supp. 3d 601, 607 (S.D. Ohio 2016) (no religious discrimination claim where the plaintiff was treated no differently than similarly situated consumers).

As Wilson provides no evidence that Twitter ever had any knowledge regarding the underlying religious motivations behind the content which led to his accounts' suspension, nor that it acted in a discriminatory manner in enforcing generally applicable rules, the undersigned **FINDS** that Wilson's complaint fails to set out facts which make a violation of Title II plausible.

### D. Legal Abuse

As a final matter, Wilson objects to Twitter's motion to dismiss and a telephone

conversation he had with counsel for Twitter. (ECF No. 20). Wilson asserts that counsel for Twitter contacted him on February 18, 2020, in order to request an extension for a filing deadline which he denied. (*Id*. at 1). Wilson states that during the course of the conversation, counsel for Twitter inquired whether Wilson was representing himself or if he had acquired counsel to whom communication should be directed. (*Id*.). Wilson states that following this conversation, counsel for Twitter filed a motion to dismiss which contained "frivolous case references," secure in the knowledge that Wilson would be unable to effectively refute their incorrect legal arguments without the representation of counsel. (*Id*. at 1-2).

Contrary to Wilson's allegations, counsel for Twitter did not submit a "frivolous" motion to dismiss, nor did their arguments in favor of dismissal amount to "legal abuse." (*Id*.). The undersigned has considered Twitter's contentions at length above and found no improper citations or legal arguments. Furthermore, to the extent that Wilson objects to counsel for Twitter's request for an extension of a filing deadline, he does not describe any conduct which suggests improper conduct on behalf of counsel for Twitter. As noted by Twitter, West Virginia Rules of Professional Conduct for attorneys prohibits attorneys from "communicat[ing] about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter..." *See* WV R RPC Rule 4.2. Accordingly, by inquiring whether Wilson was seeking to obtain counsel to whom communication should be directed, counsel for Twitter was attempting to comply with local rules governing professional conduct, not attempting to flout them.

Therefore, to the extent that Wilson's objections to counsel for Twitter's inquiry is viewed as a request for sanctions, default judgment, or any other disciplinary action, the undersigned **FINDS** this request should be denied.

In summation, the undersigned has considered the viability of Wilson's complaint under all the causes of action asserted by Wilson. Having found that Wilson is unable to proceed under any of the statutes or provisions of the Constitution mentioned in his complaint, the undersigned **FINDS** that his complaint should be dismissed.

## IV.    **Proposal and Recommendations**

For the reasons set forth above, the undersigned **RECOMMENDS** that the presiding District Judge **GRANT** Defendant's Motion for Dismissal, (ECF No. 14,); **DISMISS** the complaint with prejudice, (ECF No. 2); and **REMOVE** this matter from the docket of the Court.

Plaintiff is notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, Plaintiff shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing

parties, Judge Chambers and Magistrate Judge Eifert.

The Clerk is instructed to provide a copy of this "Proposed Findings and Recommendations" to Plaintiff, and counsel of record.

**FILED:**  May 1, 2020

_____
Cheryl A. Eifert
United States Magistrate Judge